IN THE UNITED STATES DISTRICT COURT FOR THE
WESTERN DISTRICT OF MISSOURI
WESTERN DIVISION

| | | |
|---|---|---|
| United States of America, | ) | |
| | ) | |
| Plaintiff, | ) | |
| | ) | |
| v. | ) | Criminal Action Number |
| | ) | 18-00325-01-CR-W-BCW |
| Juan Guzman, | ) | |
| | ) | |
| Defendant. | ) | |

## REPORT AND RECOMMENDATION

Pending before the Court is the MOTION TO SUPPRESS STATEMENTS TO GOVERNMENT AGENTS ON OCTOBER 18, 2018 DUE TO FAILURES AS TO ADVICE ABOUT RIGHTS, WITH SUGGESTIONS IN SUPPORT [Doc. 101] filed on June 1, 2019, by defendant Juan Guzman[1] ("Guzman"). On August 5, 2019, the undersigned held an evidentiary hearing on Guzman's motion. Guzman was present and appeared with his counsel Frederick Duchardt, Jr. The government was represented by Assistant United States Attorney Bruce Rhoades. At the evidentiary hearing, numerous matters were stipulated to and one witness testified – Special Agent Benton Roberts with the Drug Enforcement Administration. Additionally, the following exhibits were admitted into evidence:

| Number | Description |
|---|---|
| Gov't. #1 | Video recording of Guzman interview |
| Gov't. #2 | Transcript of Guzman interview |
| Gov't. #3 | Translation certification |

---

[1] As noted in the INDICTMENT [Doc. 16], Guzman has used various aliases. In some of the evidence, some of these aliases are used to refer to Guzman. For the sake of simplicity, the Court herein will use "Guzman" to refer to the defendant regardless of how he is identified in a particular item of evidence.

On the basis of all the evidence adduced at the evidentiary hearing, the undersigned submits the following:

## PROPOSED FINDINGS OF FACT

The parties essentially stipulated to the facts necessary for the Court to resolve the issues raised in Guzman's motion to suppress. Generally stated, those agreed upon facts are:

1. On October 18, 2018, at approximately 7:09 p.m., law enforcement officers executed a Jackson County, Missouri search warrant at a residence and arrested Guzman.

2. Later that same day, Guzman was interview at the Sugar Creek, Missouri Police Department by two Special Agents with the Drug Enforcement Administration ("DEA") – Tyler Mansfield and Benton Roberts.

3. Guzman, a Mexican national, does not speak English.

4. Neither SA Mansfield nor SA Roberts speak Spanish.

5. As a consequence, for the purposes of the interview, a translator – Maria Gomez-Lobo – was utilized.

6. The interpreter translated the agents' questions to Guzman and Guzman's statements to the agents.

7. The interview was audio and video recorded.

8. Subsequently, the video recording was submitted to the Joint Language Training Center ("JLTC") to prepare two written transcripts (one including both the native languages spoken during the interview and another including a translation into English of those portions of the interview that were originally spoken in Spanish).

9. The parties agree that the ensuing transcription and Spanish-to-English translations are fair and accurate.

10. The initial part of the interview contained the following colloquy:

| | | |
|---|---|---|
| TRANSLATOR: | Good morning. | |
| GUZMAN: | Good morning. | |
| TRANSLATOR: | How are you? | |
| GUZMAN: | Good. | |
| SA ROBERTS: | I got a Miranda [U/I]. . . . Can you instruct to him that I want him to read each of these out loud? | |
| TRANSLATOR: | Mm-hmm. | |
| SA ROBERTS: | Then initial or check the box next to each one. | |
| TRANSLATOR: | Do you want me to read it to him just in case? | |
| SA MANSFIELD: | Mm-hmm. | |
| SA ROBERTS: | That's fine too, just check, have him check next to it. | |
| TRANSLATOR: | OK. | |
| SA MANSFIELD: | And these? | |
| TRANSLATOR: | [U/I] pen? [U/I] | |
| SA ROBERTS: | Yeah, yeah that's. . . | |
| TRANSLATOR: | OK. Um, they want me to read this to you, is that all right? | |
| GUZMAN: | Mm-hmm. | |
| TRANSLATOR: | They want to speak to you. So before they ask you any questions, you have to understand your rights. | |
| GUZMAN: | Mm-hmm. | |

[The *Miranda* rights were then read to Guzman in Spanish]

3

| | |
|---|---|
| TRANSLATOR: | Do you understand your rights? Are you willing to answer some questions? They want you to... And put your initials here on each of these to show that you understood, to be sure that you understood, to know that you understood for sure. What they want is. . . .  Do you want to sign? |
| GUZMAN: | Mm-hmm. |
| TRANSLATOR: | What . . . what they want is to speak with you. All they want to do is, they want to talk to you. They want you to know your rights. They want you to know your rights, before speaking with you. |
| GUZMAN: | I have, have in my [U/I] a lot of problems over there. |
| TRANSLATOR: | Excuse me? |
| GUZMAN: | I have problems. |
| TRANSLATOR: | Uh-huh. |
| GUZMAN: | Since Mexico I... I [U/I] haven't brushed my teeth so that's why. . . |
| TRANSLATOR: | I'm just covering my mouth because I haven't been able to brush my teeth. |
| GUZMAN: | Oh. I. . . |
| SA ROBERTS: | That's. . . We're. . . |
| [VOICES OVERLAP] | |
| TRANSLATOR: | I haven't. . . |
| SA ROBERTS: | . . . we're far away, you're fine. |
| TRANSLATOR: | He says we're far enough you don't have to worry. |
| SA ROBERTS: | [U/I] |
| GUZMAN: | I. . . I. . . I. . . |

| | |
|---|---|
| SA ROBERTS: | We're. . . we're. . . we're with. . . We just want to talk to you. My name is Ben, this is Tyler, we. . . we're just here to talk to you. |
| TRANSLATOR: | He said, they just want to talk with you. My name is Ben and his. . . his name is Tyler. |
| GUZMAN: | I. . . I. . . I. . . Since. . . since. . . in the moment that they kicked me out. . . |
| TRANSLATOR: | From where? |
| GUZMAN: | They kicked me out of here in 2012. Ever since. . . ever since I came here I've. . . I've always been on the run the whole time.  I. . .I came over here running away. . . |
| TRANSLATOR: | Where did they kick you out of? |
| GUZMAN: | . . .they. . . they, well, the Unites States, to Mexico, I was deported. |
| TRANSLATOR: | Who kicked y. . .? |
| GUZMAN: | [U/I] |
| TRANSLATOR: | Oh, I was deported in 2012. [U/I] |
| [VOICES OVERLAP] | |
| GUZMAN: | I want to. . . I want to talk a little bit about that. Because there are a lot of people out there doing a lot of harm. |
| TRANSLATOR: | And I just want tell you this because there's a lot people in the outside, uh, hurting a lot of people. |
| SA ROBERTS: | OK. |
| GUZMAN: | My. . . my. . . my family is at risk, I know [U/I] my family because I'm. . . I didn't want to work with those people. They have me like this. I'm. . . I'm talking about last night, but there were people around and I couldn't. |

5

| | | |
|---|---|---|
| TRANSLATOR: | | I wanted to tell this since last night, but there were people there and I couldn't. Uh. . . |

[VOICES OVERLAP]

| | | |
|---|---|---|
| SA ROBERTS: | OK. |
| TRANSLATOR: | . . .because I don't want to work like this, but they're making me work like this. |
| SA MANSFIELD: | OK, let's. . . |
| TRANSLATOR: | But before we talk. . . |
| SA MANSFIELD: | Yeah. |
| SA ROBERTS: | We. . . |
| TRANSLATOR: | You can sign this, or put your initials so that. . . |
| SA ROBERTS: | [U/I] |
| TRANSLATOR: | So you can tell them everything. |
| SA ROBERTS: | He doesn't have [U/I] |
| GUZMAN: | But. . . |
| SA ROBERTS: | We read all that. If he just wants to. . . if he just wants to. . . If you want to check that the rights have been read to him. [U/I] read this part and then. . . |
| TRANSLATOR: | He says. . . OK, hold on, he says. . . Do you want to speak to them? |
| GUZMAN: | This. . . this is. . . this is [U/I] going to affect me, I don't know. I just. . . |
| TRANSLATOR: | What? |
| GUZMAN: | I just. . . I just don't know [U/I] I don't know what is going to affect me. |
| TRANSLATOR: | I don't know if this is going to affect me or not. [U/I] |

6

| | | |
|---|---|---|
| SA MANSFIELD: | | He's not admitting any guilt. |
| TRANSLATOR: | | [U/I] you're not admitting any guilt. |
| SA MANSFIELD: | | It's just. . . We need. . . we need to. . . he needs to understand his rights before we talk about [U/I] |
| TRANSLATOR: | | They just want you to know your rights before they speak to you, this is how it's done in the United States. |
| SA ROBERTS: | | See. . . |
| TRANSLATOR: | | You're not admitting any guilt with this. |
| SA ROBERTS: | | If you don't want to sign the form that's fine. I've just. . . we just need to know that you understand all of these on here. And if you want to talk to us. |
| TRANSLATOR: | | If. . . if you don't want to sign the form, that fine, we just want to make sure that you know your rights and understand them. Do you understand your rights? |
| GUZMAN: | | Yes. |
| TRANSLATOR: | | I understand my rights. |
| SA ROBERTS: | | OK. You want to. . . you want to speak to us? |
| TRANSLATOR: | | Do you want to speak to us and tell us? |
| GUZMAN: | | Yes. |
| TRANSLATOR: | | Yes. |
| SA ROBERTS: | | OK. Do you not want to sign the form? |
| TRANSLATOR: | | Do you not want to sign it? |
| GUZMAN: | | It's just that if it affects me, like you said, afterwards. . . I know it will be used against me, I know it. |
| TRANSLATOR: | | Eh, um, this might affect me and. . . and you might use anything against me. |

7

| | | |
|---|---|---|
| SA ROBERTS: | | This is just a form saying. . . It's. . . it's. . . it's the form saying. . . asking you just what I asked you that you understand your rights. You don't want to sign it, it's fine, it's just. . . |
| TRANSLATOR: | | Um. . . |
| SA ROBERTS: | | . . .saying. It's just you signing that you understand everything on that sheet. |
| TRANSLATOR: | | This form. . . By signing this form, the only thing you are saying is that you un. . . you understand what it says right here. It's in Spanish, so you can read it. When you sign here, it just states that you know that they told you that you have the right to remain silent, and that anything you say can be used against you, that. . . You understand? That's it. It's not saying anything else, nor is it incriminating you. |
| GUZMAN: | | Yeah. |

11. Guzman then signed the *Miranda* form and the interview proceeded.

12. During the course of the interview, Guzman made incriminatory and inculpatory statements.

13. Guzman – who as noted is a Mexican national – was not informed of his right to consular notification prior to his interview.

14, In addition, law enforcement officers did notify the Mexican consulate of Guzman's arrest.

15. On November 14, 2018, Guzman was indicted for Conspiracy to Distribute Methamphetamine, Conspiracy to Commit Money Laundering, Possession of Firearms and Drug Trafficking, and Illegal Re-Entry.

16. The government intends to use portions of Guzman's interview with the DEA agents during any criminal trial of Guzman.

# PROPOSED CONCLUSIONS OF LAW

In his motion to suppress before the Court, Guzman seeks the suppression of his interview with the DEA agents on October 18, 2018, for two stated reasons:

(1) the interview was procured in violation of the Fifth Amendment in that Guzman did not voluntarily, knowingly and intelligently waive his rights, and

(2) the interview was procured in violation of Article 36 of the Vienna Convention on Consular Relations, T.I.A.S. No. 6820, 21 U.S.T. 77, 1969 WL 97928, at *1 (Dec. 14, 1969), in that agents did not apprise Guzman of his right to consular access nor did agents notify the Mexican consulate of Guzman's arrest.

For the reasons set out herein, the Court denies the motion to suppress.

The Fifth Amendment of the United States Constitution commands that "[n]o person . . . shall be compelled in any criminal case to be a witness against himself." U.S. CONST. amend. V. With regard to the Fifth Amendment, the Supreme Court has found:

> The essence of this basic constitutional principle is the requirement that the [government] which proposes to convict and punish an individual produce the evidence against him by the independent labors of its officers, not by the simple, cruel expedient of forcing it from his own lips.

*Estelle v. Smith*, 451 U.S. 454, 462, 101 S. Ct. 1866, 1872 (1981). However, as the Supreme Court has made clear on numerous occasions, the right against self-incrimination does not prohibit any and all statements made by suspects to law enforcement officers from being admissible in a criminal proceeding. For example:

> [The Fifth Amendment] does not preclude a witness from testifying <u>voluntarily</u> in matters which may incriminate him, . . . for those competent and freewilled to do so may give evidence against the whole world, themselves included. . . . Indeed, far from being prohibited by the Constitution, admissions of guilt by wrongdoers, if not coerced, are inherently desirable.

*United States v. Washington*, 431 U.S. 181, 186-87, 97 S. Ct. 1814, 1818 (1977) (*emphasis added*). The touchstone of such Fifth Amendment analysis is voluntariness. *Dickerson v. United States*, 530 U.S. 428, 434, 120 S. Ct. 2326, 2331 (2000) ("We . . . continue to exclude confessions that were obtained involuntarily.").

With regard to statements made by a suspect during custodial interrogation by law enforcement, the Supreme Court, in the landmark case of *Miranda v. Arizona*, 384 U.S. 436, 86 S. Ct. 1602 (1966), enunciated a special test for ascertaining voluntariness. The reason for such special treatment stems from the Supreme Court's recognition that custodial interrogations are inherently coercive. *Dickerson*, 530 U.S. at 435, 120 S. Ct. at 2331; *New York v. Quarles*, 467 U.S. 649, 654, 104 S. Ct. 2626, 2630 (1984). Indeed, in *Miranda,* the Supreme Court observed that custodial interrogations, by their very nature, generate "inherently compelling pressures which work to undermine the individual's will to resist and to compel him to speak where he would not otherwise do so freely." *Miranda*, 384 U.S. at 467, 86 S. Ct. at 1624. Consequently,

> To combat this inherent compulsion, and thereby protect the Fifth Amendment privilege against self-incrimination, *Miranda* imposed on the police an obligation to follow certain procedures in their dealings with the accused.

*Moran v. Burbine*, 475 U.S. 412, 420, 106 S. Ct. 1135, 1140 (1986). These procedures, now almost universally familiar, include fully apprising a suspect of the prosecution's intention to use his statements to secure a conviction and informing him of his rights to remain silent and to have counsel present if he so desires. *Miranda*, 384 U.S. at 468-70, 86 S. Ct. at 1624-26.

Despite the inherently coercive nature of custodial interrogations, it is well settled that a criminal suspect may waive the rights contained in the *Miranda* warnings "provided the waiver is made voluntarily, knowingly and intelligently." *Miranda*, 384 U.S. at 444, 86 S. Ct. at 1628. However, "[a] waiver of *Miranda* rights is invalid if, in the totality of the circumstances, the

10

accused's will was overborne." *United States v. Holloway*, 128 F.3d 1254 (8th Cir.1997); *see also United States v. Caldwell*, 954 F.2d 496, 505 (8th Cir.1992) (waiver of *Miranda* rights is determined under totality of the circumstances and in light of entire course of police conduct).

In *United States v. Boyd*, 180 F.3d 967 (8th Cir.1999), the Eighth Circuit explained how to determine whether a waiver of *Miranda* rights is valid:

> The determination of whether an accused has knowingly and voluntarily waived his *Miranda* rights depends on all the facts of each particular case. The circumstances include the background, experience, and conduct of the accused. The government has the burden of proving that the defendant voluntarily and knowingly waived his rights.

*Id*. at 977 (*internal citations omitted*); *see also United States v. Barahona*, 990 F.2d 412, 418 (8th Cir.1993) (government bears burden of proving by preponderance of evidence that defendant knowingly, voluntarily, and intelligently waived his rights).

Thus, an inquiry into whether a suspect's *Miranda* rights have been waived "has two distinct dimensions." *Moran*, 475 U.S. at 421, 106 S.Ct. at 1141. The Court has explained:

> First, the relinquishment of the right must have been voluntary in the sense that it was the product of a free and deliberate choice rather than intimidation, coercion, or deception. Second, the waiver must have been made with a full awareness of both the nature of the right being abandoned and the consequences of the decision to abandon it.

*Id*. at 421, 106 S. Ct. at 1141. The *Moran* court further noted that "[o]nly if the totality of the circumstances surrounding the interrogation reveals both an uncoerced choice and the requisite level of comprehension may a court properly conclude that the *Miranda* rights have been waived." *Id*. (*quoting Fare v. Michael C.*, 442 U.S. 707, 725, 99 S. Ct. 2560, 2571 (1979)). These principles subsequently have been summarized by lower courts. For instance, in *Holman v. Kemna*, 212 F.3d 413 (8th Cir. 2000), the Eighth Circuit found:

> A waiver is voluntary if it is the product of a free and deliberate choice rather than intimidation, coercion, or deception. A waiver is knowing and intelligent if it has been made with a full awareness of both the nature of the right being abandoned and the consequences of the decision to abandon it.

*Id*. at 420.

In this case, the Court has carefully reviewed the video recording of Guzman's interview as well as the transcription of the interview. Despite the language barrier between the two DEA agent and Guzman, the Court concludes that the government has produced sufficient evidence that Guzman was able to communicate effectively with the translator and, through the translation, acknowledged verbally and in writing that he understood his rights and was willing to speak with officers without the benefit of the presence of counsel. There is no evidence before the Court tending to show that Guzman was in any way impaired on October 18, 2018 or that officers threated, coerced, or intimidated Guzman.

The dispositive issue before the Court is whether Guzman's waiver of his rights was voluntary. Based on the record before the Court, it was. Guzman's statements made in his post-arrest interview – including any inculpatory statements – are not subject to suppression.

In addition to the Fifth Amendment, Guzman also argues that his interview is subject to suppression based on an alleged violation of the Vienna Convention on Consular Relations. Article 36 of the treaty provides:

> 1. With a view to facilitating the exercise of consular functions relating to nationals of the sending State:
>
>    (a) consular officers shall be free to communicate with nationals of the sending State and to have access to them. Nationals of the sending State shall have the same freedom with respect to communication with and access to consular officers of the sending State;

> (b) if he so requests, the competent authorities of the receiving State shall, without delay, inform the consular post of the sending State if, within its consular district, a national of that State is arrested or committed to prison or to custody pending trial or is detained in any other manner. Any communication addressed to the consular post by the person arrested, in prison, custody, or detention shall also be forwarded by the said authorities without delay. The said authorities shall inform the person concerned without delay of his rights under this sub-paragraph;
>
> (c) consular officers shall have the right to visit a national of the sending State who is in prison, custody, or *886 detention, to converse and correspond with him and to arrange for his legal representation. They shall also have the right to visit any national of the sending State who is in prison, custody, or detention in their district in pursuance of a judgment. Nevertheless, consular officers shall refrain from taking action on behalf of a national who is in prison, custody, or detention if he expressly opposes such action.
>
> 2. The rights referred to in paragraph 1 of this Article shall be exercised in conformity with the laws and regulations of the receiving State, subject to the proviso, however, that the said laws and regulations must enable full effect to be given to the purposes for which the rights accorded under this Article are intended.

*Vienna Convention*, at *1, 21 U.S.T. at 100–01. In sum, "when a national of one country is detained by authorities in another, the authorities must notify the consular officers of the detainee's home country if the detainee so requests." *Sanchez-Llamas v. Oregon,* 548 U.S. 331, 338, 126 S. Ct. 2669, 2675 (2006). However, as noted by the Court in *Sanchez-Lamas*:

> [E]ven if . . . Article 36 implicitly requires a judicial remedy, the Convention equally states that Article 36 rights shall be exercised in conformity with the laws and regulations of the receiving State. Under our domestic law, the exclusionary rule is not a remedy we apply lightly.

*Id*. at 347, 126 S. Ct. at 2680. After analyzing the purposes for the exclusionary rule, the Court concluded that a violation of the Vienna Convention does <u>not</u> require suppression. *Id*. at 349, 126 S. Ct. at 2681 ("The failure to inform a defendant of his Article 36 rights is unlikely, with any frequency, to produce unreliable confessions."). Accordingly, it is

13

**RECOMMENDED** that the Court, after making an independent review of the record and applicable law, enter an order **DENYING** the MOTION TO SUPPRESS STATEMENTS TO GOVERNMENT AGENTS ON OCTOBER 18, 2018 DUE TO FAILURES AS TO ADVICE ABOUT RIGHTS, WITH SUGGESTIONS IN SUPPORT [Doc. 101] filed on June 1, 2019, by defendant Juan Guzman.

Counsel are reminded that each has 14 days from the date of receipt of a copy of this report and recommendation to file and serve specific objections to the same. A failure to file and serve timely objections shall bar attack on appeal of the factual findings in this report which are accepted or adopted by the district judge except upon the ground of plain error or manifest injustice.

                                                    */s/ John T. Maughmer*
                                                    **John T. Maughmer**
                                          **United States Magistrate Judge**